# In the United States District Court
## for the Southern District of Georgia
### Brunswick Division

BERYL HANKERSON,          *
                          *
                          *
    Plaintiff,            *
                          *
    vs.                   *          CV 2:12-00097
                          *
SOUTHEAST GEORGIA HEALTH  *
SYSTEM                    *
                          *
    Defendant.            *

## ORDER

Presently before the Court is a Motion for Summary Judgment filed by Defendant Southeast Georgia Health System. See Dkt. No. 22. For the reasons stated below, Defendants' motion is **GRANTED**.

## BACKGROUND

Plaintiff began working as an Acute Care biller for Southeast Georgia Health System ("SGHS") in 1998, having worked as a Unit Coordinator in the Emergency Department prior to that time. Dkt. No. 31-4, pg. 3 (Lynn Am. Dec.). The Acute Care billing department consists of twelve billers, six of whom are white and six of whom are black. Dkt. No. 25-4, 12: 1-12 (Lynn

AO 72A
(Rev. 8/82)

Dep.). Prior to Plaintiff's termination, seven were black and five were white. Id. Each biller is assigned a "unit" of certain kinds of accounts. Dkt. No. 31-4, pg. 3. (Lynn Am. Dec.).The billers use computer software that generates reports indicating "error" accounts, which the billers then determine how to correct. To "work" an account, a biller must enter a code that indicates the account's status, the biller's representative code, and a follow-up alert. If accounts are not properly coded and filed within the time specified by insurers, the insurers will not pay the accounts. Consequently, SGHS must "write off" these account charges, resulting in non-payment for those monies. Id.

The Acute Care billers were initially divided among Medicare, Medicaid, and commercial accounts. Dkt. No. 25-4, 8: 4 (Lynn dep.). Prior to 2009, Plaintiff worked exclusively as a Medicaid biller. According to Amy Lynn ("Lynn"), Patient Account Supervisor, Plaintiff used to be "awesome on Medicaid." Id. In fact, Lynn stated that Plaintiff received very good evaluations for her billing performance until 2009. Dkt. No. 25-4, 13: 3-6 (Lynn dep.). In April of 2009, the unit was reorganized into government and non-government billing, meaning that Plaintiff, as a Medicaid biller, was required to learn Medicare billing as well. Dkt. No. 25-4, 7: 1 (Lynn dep.).

AO 72A
(Rev. 8/82)

Lynn testified that during 2009, the unit began having problems with Plaintiff not working the accounts, resulting in Plaintiff receiving write-ups. Dkt. No. 25-4, 14: 1-5 (Lynn dep.). In 2009, prior to the reorganization, Plaintiff took a leave of absence for health reasons. Dkt. No. 31-4, pg. 4 (Lynn Am. Dec.). During Plaintiff's leave, it was discovered that Plaintiff had not followed up on 69 of the accounts in her unit, a total of $141,000, resulting in SGHS having to write off a percentage of payment from these accounts. Dkt. No. 31-4, pg. 4 (Lynn Am. Dec.). Furthermore, although Plaintiff set reminders on many accounts, she did not take the necessary corrective action on them. Additionally, she neglected to enter her representative code, when doing so would have reminded her to follow up on the accounts. Id. As a result, Plaintiff received a final written warning in March of 2009, and was assigned to a 90-day corrective action plan, by which she was required to meet with Lynn every week. Dkt. No. 25-4, 14: 8-25 (Lynn dep.); Dkt. No. 31, Exh. D.

Before the department reorganization, Plaintiff and two other women, Laurel Singleton and Janice Williams, both African American, exclusively billed Medicaid accounts. Dkt. No. 31-4, pg. 5 (Lynn Am. Dec.). After the reorganization, they participated in group training for billing Medicare. Lynn asserted that Plaintiff's trainer "reported that she was having

AO 72A
(Rev. 8/82)

trouble training [Plaintiff] because [Plaintiff] was frequently engaged in personal telephone calls." Id. Lynn also noted that billers assigned to cover Plaintiff's unit during Plaintiff's vacation in 2010 realized that many of Plaintiff's accounts were delinquent. Dkt. No. 31-4, pg. 5 (Lynn Am. Dec.). Furthermore, upon reviewing Plaintiff's unit in 2010, Lynn discovered over 300 delinquent accounts, and attributed this to Plaintiff's "spend[ing] too much time in personal conversations with co-workers and on the phone." Dkt. No. 31-4, pg. 7-8 (Lynn Am. Dec.). As of January 14, 2011, the number of Plaintiff's outstanding accounts totaled 368, fluctuating to 415 as of January 21, 2011, and 387 as of January 28, 2011. Dkt. No. 31-4, Exh. F. Defendant thus had to write off monies from Plaintiff's delinquent accounts. Dkt. No. 31-4, pg. 9 (Lynn Am. Dec.).

Training

Plaintiff alleges that Defendant discriminated against her by providing her with inadequate training in Medicare billing practices. Dkt. No. 31-1, Exh. D-45. Plaintiff alleges that she requested training on numerous occasions and was not provided with proper training. Dkt. No. 31-1, Exh. D-45. Thomas testified that she was "surprised" by Plaintiff's statement because she "knew that [Plaintiff] had been with the Health System in the business office for a long time." Dkt. No. 31-4, 31: 18-25 (Thomas dep.). According to Lynn, Plaintiff received the same

Medicare training as the two other women who exclusively billed Medicaid prior to the reorganization. Neither of those billers needed further training to successfully bill. Dkt. No. 31-4, pg. 9 (Lynn Am. Dec.). Furthermore, Lynn testified that Plaintiff only mentioned having trouble with Medicare one time, which was after Lynn emailed Plaintiff regarding Plaintiff's accounts. It is undisputed that Lynn responded by getting another biller, Aysha Williams, to help Plaintiff. Dkt. No. 25-4, 8:15-25, 9:1-8 (Lynn dep.).

Plaintiff alleges that on November 4, 2009, she requested additional Medicare training from Amy Lynn and Linda Herbert and did not receive it. Dkt. No. 23-1, 134: 16-24 (Hankerson dep.); Dkt. No. 23, Exh. D-43. However, Plaintiff later admitted that "Aysha sat with me and showed me Florida Shared for the denials that I had that day." Dkt. No. 23-1,168: 24-25 (Hankerson dep.). Plaintiff further explained that Florida Shared is the computer system used for Medicare accounts. Dkt. No. 23-1, 169: 3-6 (Hankerson dep.).

Transfer Request

Plaintiff also contends that Defendant discriminated against her by refusing to transfer her to a different department, on February 17, 2010. Dkt. No. 23-1, 137: 15-21 (Hankerson dep.); Dkt. No. 23, Exh. D-43. Plaintiff alleges that the requested transfers of white employees were granted and

AO 72A
(Rev. 8/82)

claims that Defendant did not accept her request to transfer based on her race. Dkt. No. 31, Exh. D-53, pg. 29.

The Defendant brought forth the relevant policies. SGHS policy prohibits transfer of an employee who has received a Level III final written action from being transferred for twelve months after the last corrective action, absent special approval by Human Resources Management. Dkt. No. 23-5, ¶ 6 (Thomas dec.); Dkt. No. 23-5, Exh. A. Plaintiff received a final written warning on May 25, 2009 for delinquent accounts. Dkt. No. 23-5, Exh. D. Plaintiff received an additional final written warning on February 23, 2010 for inappropriate behavior when another employee parked in a spot that Plaintiff apparently wanted. Dkt. No. 23-5, Exh. F. The warning specifies that Plaintiff "used foul language and threatening tone demanding that the team member give up the parking space." Dkt. No. 23-5, Exh. F. The employee alleged that Plaintiff became "irate," called her a "bitch" twice, and behaved in such a way that the employee "feared for [her] safety." Dkt. No. 23-5, Exh. E. Plaintiff disputed that she used foul language, but admits that the employee may have found her behavior aggressive. Dkt. No. 23-1, 107:5-10 (Hankerson dep.). Both warnings constituted Level III final written corrective actions. As such, Plaintiff could not transfer into a different department from March 25, 2009 through February 23, 2011. Dkt. No. 23-5, pg. 3. (Thomas Dec.)

AO 72A
(Rev. 8/82)

The Defendant has set forth in the record a reason for every other transfer. One employee (Corbin) moved from a clerical position to a data entry position as part of her team's reorganization. Dkt. No. 31-4, pg. 9-10 (Lynn Am. Dec.). Four employees (Donner, McElroy, McMenamin, and Parkinson) changed positions after applying for posted positions and being selected as part of SGHS's selection process. Id. According to Lynn, Plaintiff did not submit such a request to transfer. Dkt. No. 25-4, 18:16 (Lynn dep.). Lastly, Lynn chose Perkins to transfer into Inpatient billing as part of the unit's reorganization. Dkt. No. 31-4, pg. 10-11 (Lynn Am. Dec.). She based her choice on Perkins's qualifications. Lynn asserted, "I needed a biller working inpatient that was accurate and thoroughly reviewed accounts so that they were filed correctly the first time, so that payment would be received more quickly. Perkins was (and is) possibly the most thorough out of the other 12 Government billers." Id. Lynn further noted:

> During my tenure as Supervisor of Patient Financial
> Services, no biller has ever been reassigned or had
> their duties (including their unit) changed other than
> by formal transfer request or as part of a management-
> initiated reorganization. The only exception to this
> was when I assigned another biller to work on the "A"
> portion of Hankerson's inpatient government unit, but
> that was a temporary arrangement that began in June
> 2010 and ended on January 2, 2011. Dkt. No. 31-4, pg.
> 11 (Lynn Am. Dec.).

TERMINATION

Plaintiff was terminated on February 15, 2011. Dkt. No. 25-5. The Georgia Department of Labor Discharge Report noted the reason for termination as "progressive discipline, poor performance, and behavioral issues." Id. According to Angelynn Thomas, human resources generalist with SGHS, the primary reason for Plaintiff's termination was delinquent billing. Dkt. No. 25-3, 26: 11-14 (Thomas dep.). Thomas testified, "she was in progressive discipline, but the final incident was the inadequate billing processes, or she was not following the billing processes adequately." Id. Thomas specifically noted that a "level four infraction" is grounds for automatic termination. Thomas also explained that "because she was in progressive discipline her billing practices were enough to be a level four termination." Dkt. No. 25-3, 28:9-20 (Thomas dep.).

Plaintiff received numerous warnings prior to termination. Dkt. No. 25-5. Plaintiff acknowledged during deposition that she was advised that further performance problems could result in termination. Dkt. No. 23-1, 105: 3-7 (Hankerson dep.). Plaintiff also had an opportunity to dispute her warnings through SGHS's formal grievance system but she chose not to do so. Dkt. No. 23, 110: 16-24 (Hankerson dep.). She testified that she "just didn't" and that there was no reason why she did not dispute them. Id.

AO 72A
(Rev. 8/82)

The decision to terminate Plaintiff was not made by one person, but rather by a group. Thomas testified, "[i]t's by committee, and that would include people up her chain and my chain of command." Dkt. No. 25-3, 6:17-22 (Thomas dep.). Lynn testified that she and her manager, Dee-Dee Smith, agreed that Plaintiff's employment should be terminated because they "agreed that [they] had given her every opportunity that [they] could, and [they] could not afford to continue to let the AR get behind and have to write off accounts." Dkt. No. 25-4, 10: 8-25; 11: 1-3. Lynn testified that Linda Herbert, Plaintiff's Team Leader, agreed with this decision. Dkt. No. 25-4, 11: 4-9. Plaintiff was replaced by a white employee, Crystal Willis, thus making the racial composition of the department six white employees and six African American employees. Dkt. No. 25-4, 11: 10-17; 12: 1-8.

Plaintiff filed an EEOC charge on April 11, 2011. Dkt. No. 23-1, 133: 23-25 (Hankerson dep.) and thereafter filed the present lawsuit.

### LEGAL STANDARD

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could impact the outcome in a case. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). A dispute is genuine only where the jury could issue a

AO 72A
(Rev. 8/82)

verdict in the nonmoving party's favor. Id. In determining whether summary judgment is appropriate, the court will view the evidence "in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The moving party bears the burden of showing a lack of genuine issue of material fact. Adickes, 389 U.S. at 157. The movant should do so by identifying "particular parts of materials in the record" which indicate "the absence…of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A). It is only after the moving party has fulfilled this burden that the party opposing summary judgment bears a burden of responding. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmovant will defeat a motion for summary judgment by presenting evidence "such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In employment discrimination cases,

"if the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." Chapman v. Al Transport, 229 F.3d 1012, 1025 (11th Cir. 2000).

AO 72A
(Rev. 8/82)

## DISCUSSION

Plaintiff alleges that racial bias motivated discriminatory treatment toward her at work, in violation of Title VII of the Civil Rights Act. Dkt. No. 1. Title VII prohibits discrimination regarding "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), the plaintiff in a Title VII case must establish a prima facie case of race discrimination. Demonstrating a prima facie case only requires the plaintiff to put forth facts that create an inference of discrimination. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). After showing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp., 411 U.S. at 802. According to the Eleventh Circuit, the defendant's burden is "exceedingly light." Holifield, 115 F.3d at 1564 (quoting Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994). The plaintiff then bears the burden of producing sufficient evidence of pretext. Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 248 (1981). Thus, the plaintiff must show the court that race motivated the employment decision. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1092 (11th Cir. 2004).

To establish a prima facie case of discrimination, the plaintiff must prove that she: 1) belonged to a racial minority; 2) was subjected to adverse job action; 3) was treated less favorably than similarly situated, non-minority employees; and 4) was qualified for the job. Holifield, 115 F.3d at 1562; Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). The plaintiff may also satisfy the prima facie case by proving that, rather than 3) as listed above, the employee "was replaced by a person outside the protected class." Coutu v. Martin Cnty. Bd. of Cnty. Com'rs, 47 F.3d 1068, 1073 (11th Cir. 1995).

**Prima Facie Case**

A. Inadequate Training Allegation

Plaintiff alleges that she requested additional training that was denied on account of her race. Dkt. No. 31-1, Exh. D-45. However, Plaintiff has not established a prima facie case of discrimination with regard to this claim. The first and fourth elements of the prima facie case are established because it is undisputed that Plaintiff belongs to a racial minority and that Plaintiff was qualified to do her job. However, Plaintiff has not shown the Court that elements 2) and 3) are satisfied—that she was subjected to an adverse job action and was treated less favorably than similarly situated, non-minority employees.

AO 72A
(Rev. 8/82)

Adverse Job Action Element

Plaintiff has failed to show the Court that her alleged failure to receive extra training constituted an adverse job action. Adverse employment actions are those that have a "materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related." Forbes v. City of North Miami, 509 Fed.Appx. 864, 867 (11th Cir. 2013)(quoting Crawford v. Carroll, 529 F.3d 961,973 (11th Cir. 2008)).

Plaintiff has not met the requisite standard for adverse employment action. Even if Defendant denied Plaintiff additional training, Plaintiff has not shown that this denial had a materially adverse effect on her. Any assumption that her termination stemmed from training denials is unsupported speculation. An "employer's denial of an employee's request for training is not, without more, an adverse employment action." Holland v. Pilot Travel Ctrs., No. 5:09-CV-262 (CAR), 2010 WL 2732047, at *6 (M.D.GA, 2010)(quoting Box v. Principi, 442 F.3d 692, 697 (8th Cir. 2006). In fact, the Eleventh Circuit recognized that a denial of training, alone, is insufficient to constitute an adverse employment action. Jarvis v. Siemens Medical Solutions USA, Inc., 460 Fed.Appx. 851, 859 (11th Cir. 2012) (noting that "regarding the denial of training, nothing in the record shows how this action adversely affected Jarvis.") Furthermore, this district previously determined that a denial

AO 72A
(Rev. 8/82)

of a request to cross-train in various medical scanning areas did not rise to the level of adverse employment action. Gehringer v. St. Joseph's/Candler Health System, Inc., No. 4:12-cv-77, 2013 WL 1180920, at *6 (S.D.Ga. 2013). Here, Plaintiff has not presented evidence that alleged training denials constituted adverse employment action. Having failed to make the required showing of an adverse employment action, Plaintiff's Title VII race discrimination claim in this regard fails as a matter of law.

Similarly Situated Element

As noted above, Plaintiff alleges that she requested training and her request was denied, but that white employees received additional training. Plaintiff claims that she was "refused" adequate training based on her supervisor's "racial animosity." Dkt. No. 25, pg. 7. Plaintiff makes this claim in hopes of showing that she was treated less favorably than non-minority, similarly situated employees. "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." Holifield, 115 F.3d 1555 at 1562. Determining whether employees are similarly-situated requires the Court to look at whether they "are involved in or accused of the same or similar conduct and are disciplined in different ways." Brown v. Jacobs Engineering, Inc., 401 Fed.

AO 72A
(Rev. 8/82)

Appx. 478, 480 (11th Cir. 2010) (quoting Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999)).

Plaintiff's claim is flawed for two reasons. First, Plaintiff has failed to show that Defendant denied her adequate training. Plaintiff received initial training, just as the two other employees who were similarly situated to her (African American women who had previously only billed Medicaid) received initial training. Dkt. No. 31-4, pg. 5 (Lynn Am. Dec.). Plaintiff asserts that Rasheeda Brown, her trainer, "was not trained to train others as how to do Medicare billing." However, Ms. Brown had experience training several people in the past. Dkt. No. 25-4, 20: 7-19 (Lynn dep.). Lynn testified that she trained each of them successfully and that they are all still employed by SGHS. Id.

Even if Ms. Brown did fail to train Plaintiff properly, Plaintiff received further training from Aysha Williams, as previously noted. Furthermore, Plaintiff testified that she could ask questions of experienced Medicare billers in her department. Dkt. No. 23-1, 166: 18-21 (Hankerson dep.). Plaintiff has failed to produce evidence to show that she received inadequate training, much less that any training failure was prompted by racial animosity. Rather, the undisputed facts establish that Plaintiff was an experienced biller who had trouble with a new system, but who had opportunities to get

AO 72A
(Rev. 8/82)

outside assistance through the help of Aysha Williams and other billers in her department. Plaintiff acknowledged that she could seek assistance from other billers, yet she failed to do so. Plaintiff's evidence does not support a case of racial discrimination.

Second, Plaintiff has failed to show that Defendant provided extra training to similarly situated white employees. Plaintiff initially claimed that Defendant provided white employees with training that was denied to her. However, Plaintiff testified that the training to which she referred was given to the white employees when they switched to Medicaid billing. She specifically said, "[i]t was when they started doing that particular job." Dkt. No. 23-1, 136: 2-17 (Hankerson dep.). Plaintiff received initial training when she switched to Medicare, just as these employees received initial training when they switched to Medicaid. Therefore, at the time she allegedly requested new training, she was not similarly situated to employees new to a billing system. "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." Holifield, 115 F.3d 1555 at 1562. As an experienced biller who had already received initial training on a new billing system, she was not "similarly situated in all relevant respects" to employees receiving

AO 72A
(Rev. 8/82)

initial training on a billing system new to them. Thus, Plaintiff failed to establish element 3) of the prima facie case.

## B. Refusal to Transfer

Plaintiff alleges that she suffered from discrimination because Defendant refused to transfer her to a different department. Dkt. No. 23-1, 137: 15-21 (Hankerson dep.); Dkt. No. 23, Exh. D-43. Plaintiff's EEOC Intake Questionnaire specifies that this act took place on February 17, 2010. Dkt. No. 23, Exh. D-43. On the questionnaire, Plaintiff notes that "Amy Lynn denied me a transfer to another department. In September, David Boland informed me I was ineligible for a transfer because of my performance." Dkt. No. 23, Exh. D-43.

Plaintiff has failed to present facts sufficient to show a prima facie race discrimination case based on her failure to transfer. It is undisputed that Plaintiff belonged to a racial minority. However, Plaintiff has not presented evidence for the remaining elements: that the refusal to transfer her to a different department constituted an adverse job action, that she was treated less favorably than similarly situated, non-minority employees, and that she was qualified for a job in a different department.

As noted above, Plaintiff was restricted from transferring to a different department from March 25, 2009 through February 23,

AO 72A
(Rev. 8/82)

2011 without special approval. Dkt. No. 23-5, pg. 3 (Thomas dec.). SGHS policy provides that "[a] team member who has received a Level III final written corrective action is not eligible for transfer for a period of twelve (12) months from the date of the most recent protective action, unless approved by Human Resource Management." Dkt. No. 23-5, Exh. B. Plaintiff received final written warnings on March 25, 2009 and February 23, 2010. Dkt. No. 23-1, Exh. D-36; Dkt. No. 23-1, Exh. D-37. Therefore, Plaintiff was restricted from transfer without special approval through February 23, 2011, twelve months after the date of the most recent corrective action.[1] As noted above, Plaintiff's EEOC Intake Questionnaire specifies that the transfer refusal took place on February 17, 2010, which falls within the dates in which her transfer was restricted.

Furthermore, the undisputed facts show that Plaintiff did not even apply for any posted positions. Therefore, she is not similarly situated to the billers who applied for transfers and were transferred accordingly. She is also not similarly situated to the biller who changed positions as part of her team's organization, or to the biller chosen by Lynn to transfer based on her stellar performance record.

---

[1] Plaintiff shows that the final corrective action for her second Final Written Warning was received on February 11, 2010. Dkt. No. 25-5, pg. 4. Even so, this dispute is not material because February 11, 2010 falls within twelve months of the date of her first Final Written Warning, and her ability to transfer to a different department was therefore restricted.

AO 72A
(Rev. 8/82)

C. Termination

As noted above, after a plaintiff establishes a Title VII prima facie case, the defendant must show that non-racial reasons existed for Plaintiff's termination. McDonnell Douglas Corp., 411 U.S. at 802. The burden then switches back to the plaintiff to show that the reasons the defendant articulated were pretextual. Texas Dept. of Cmty Affairs, 450 U.S. at 248. To survive summary judgment, the plaintiff must provide enough evidence to "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir.1994)). Plaintiff has not cast sufficient doubt.

Plaintiff adequately established a Title VII race discrimination prima facie case regarding her termination. It is undisputed that she belonged to a racial minority, was subjected to adverse job action, was replaced by a white employee, and was qualified for the job. Therefore, the burden switched to Defendant to show non-racial reasons for her termination. Defendant met this burden.

By the date of her termination in February of 2011, Plaintiff had received multiple warnings about inadequate

AO 72A
(Rev. 8/82)

billing and behavior problems. See Dkt. No. 23, Exh. D; Dkt. No. 23, Exh. F. She did not dispute these warnings. Dkt. No. 23-1, 110:16-24 (Hankerson dep.). Plaintiff testified that she understood that future misbehavior could subject her to termination. Dkt. No. 23-1, 105: 3-7 (Hankerson dep.). Defendant provided copies of each warning, supplemented by testimony explaining that they led to her termination.

Plaintiff attempted to show discrimination by alleging that a white employee, Kerry Jones ("Jones"), remained employed after losing a $27,000 account. Dkt. No. 25-1, pg. 3 (Hankerson Aff.). However, Plaintiff has not shown that Jones was similarly situated to her. As noted above, Plaintiff has a record of disciplinary warnings and a history of billing delinquency. Plaintiff does not provide similar information about Jones. See id. In Knight v. Baptist Hosp. of Miami, Inc., the Eleventh Circuit determined that two employees were not similarly situated where one employee's record was "substantially better" than the other's. 330 F.3d 1313, 1317 (11th Cir. 2003)(finding employees not to be similarly situated where "Knight's history of performance problems is substantially worse than Arnold's.") Similarly, according to evidence put forth by Plaintiff, Plaintiff's record remains "substantially worse" than Jones's. Plaintiff claims that the hospital's retention of Jones after one instance of delinquency evidences discrimination. However,

Plaintiff was not terminated after her first instance of delinquency either. Rather, the record facts show unrebutted evidence that she was terminated after developing a long history of repeated delinquency. Thus, Plaintiff fails to show that Jones was similarly situated. Defendant met its burden of producing sufficient evidence of non-racial reasons for termination. At this point, the burden switched to Plaintiff to show that Defendant's reasons were merely pretextual.

**Pretext**

In a-very-last effort to avoid summary judgment, Plaintiff waited until the end of the case to reveal her contention that a racial comment was made by an African-American co-worker. For completeness sake, that comment must be addressed.

This case was filed a year and a half ago. Well before that time, Hankerson set forth her discrimination charge with the EEOC. Therefore, for more than two years Hankerson has contended that the hospital fired her based on racial animus. Nonetheless, Hankerson waited until the end of this litigation—until filing an Opposition to Defendant's Motion for Summary Judgment—to reveal what she considers to be a material if not focal piece of evidence supporting her contention that she was fired because she is African-American. In June of 2013, Plaintiff filed an affidavit revealing for the first time her contention that an African-American co-worker, Linda Herbert ("Herbert"), "stated

to me that she preferred to work with white employees and that white employees were more capable." Dkt. No. 25-1, pg. 3 (Hankerson Aff.). Inexplicably, she waited until after filing her EEOC charge (Dkt. No. 31-1, Exh. D-45), completing her EEOC questionnaire (which asks her to set forth the reasons she contends racial animus factored into the termination)(Dkt. No. 23-1, Exh. D-43), after her deposition (Dkt. No. 23-1), and after the interrogatory responses (a number of which asked for just this sort of information) (Dkt. No. 31-1, Exh. D-53) to ever reveal this contention. Even if the Federal Rules of Civil Procedure could be contorted to allow, indeed invite, such trial by ambush tactics, it would not prevent summary judgment in this particular case.

According to the Eleventh Circuit, remarks that are "isolated and unrelated to the challenged employment decision are not direct evidence of discrimination." Rojas v. Fla., 285 F.3d 1339, 1342-43 (11th Cir. 2002)(noting that isolated remarks can only serve as circumstantial evidence of pretext). The Court must look at the remark together with the whole record and proffered evidence. Id. at 1343. According to the U.S. Supreme Court, a "disputed word will not always be evidence of racial animus . . . [t]he speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." Ash v. Tyson Foods, Inc., 546

AO 72A
(Rev. 8/82)

U.S. 454, 456 (2006).

Additionally, Plaintiff fails to show that the comment impacted the group's decision to terminate her. Specifically, Plaintiff provides no evidence to show that the comment, rather than her history of disciplinary actions, led to the group's decision. Herbert served as Plaintiff's team leader, but not as her supervisor (Dkt. No. 25-4, 9: 19-20), and Herbert's participation in the decision to terminate Plaintiff was as part of a group. Dkt. No. 25-3, 6:17-22 (Thomas dep.). An isolated comment is not sufficient, alone, to show that it impacted a termination decision. Jenner v. Bank of America Corp., 304 Fed.Appx. 857, 859 (11th Cir. 2009) The Eleventh Circuit specifically determined that an employer's comment that an employee should have his photograph airbrushed was too unrelated to show that the employer was motivated by age discrimination. See id. (noting that the employer's "remote comment does not suggest anything about his state of mind when he agreed months later with the group decision to terminate Jenner's employment"). Furthermore, even stray comments made by decision makers that are unrelated to the decision-making process are not direct evidence of discrimination. Twymon v. Wells Fargo & Co., 462 F.3d 925, 934 (8th Cir. 2006)(noting that the statements were "racially offensive and misguided" yet were not "made during the decisional process accompanying Wells Fargo's

23

termination of Twymon.") Any notions that Herbert harbored negative thoughts about her own race that impacted the group decision to terminate Plaintiff are merely speculation. As in Jenner, Plaintiff has not shown that the discriminatory statement was related to her termination.

Having failed to show that the reasons articulated by Defendant were pretexts, Plaintiff's Title VII race discrimination claim fails as a matter of law.

## CONCLUSION

It should be noted that resolution of this Order was unusually challenging due to the fact that Plaintiff made blanket denials of documented facts without any citation to the record in responding to Defendant's Statement of Undisputed Facts. Instead of rejecting Plaintiff's assertions, the Court sifted through every line of every page of every document in an attempt to find evidence of a material dispute. None was found. Plaintiff has failed to present a genuine dispute of material fact with regard to her Title VII race discrimination claims. As such, Defendants' motion for summary judgment is **GRANTED**. The Clerk of Court is instructed to close the case and enter an appropriate judgment.

AO 72A
(Rev. 8/82)

**SO ORDERED**, this 15TH day of October, 2013.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)